1  Nicholas P. Roxborough
   (State Bar No. 113540)
2  npr@rpnalaw.com
   David R. Ginsburg
3  (State Bar No. 210900)
   drg@rpnalaw.com
4  Joseph C. Gjonola
   (State Bar No. 241955)
5  jcg@rpnalaw.com
   Members of **ROXBOROUGH,**
6      **POMERANCE, NYE &**
       **ADREANI, LLP**
7  5820 Canoga Avenue, Suite 250
   Woodland Hills, California 91367
8  Telephone:  (818) 992-9999
   Facsimile:   (818) 992-9991
9

10 Attorneys for Defendant and Counterclaimant
   First Rate Staffing Corporation
11

12         **THE UNITED STATES DISTRICT COURT FOR THE CENTRAL**

13         **DISTRICT OF CALIFORNIA — WESTERN DIVISION**

| | |
|---|---|
| 14  ZURICH AMERICAN INSURANCE COMPANY OF ILLINOIS, | Case No. 2:17-cv-4864-CAS(KSx) |
| 15 | |
| 16         Plaintiff, | |
| 17      v. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION FOR LEAVE TO AMEND ANSWER AND COUNTERCLAIM AND CONTINUE THE TRIAL** |
| 18  FIRST RATE STAFFING CORPORATION, et al., | |
| 19         Defendants. | |
| 20 | |
| 21  FIRST RATE STAFFING CORPORATION, | |
| 22         Counterclaimant, | |
| 23      v. | COURTROOM:  8D |
| 24  ZURICH AMERICAN INSURANCE COMPANY OF ILLINOIS | |
| 25 | HON. CHRISTINA A. SNYDER |
| 26         Counter-Defendant. | |

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.   **INTRODUCTION**

As explained in First Rate's existing and proposed counterclaim, First Rate had workers' compensation insurance through Zurich from May 7, 2012 to May 7, 2015. Workers compensation premium is determined by a number of factors.  Among those are the nature of the work being performed, yearly payroll, costs of reported claims, schedule modification, and the carrier selected to underwrite the policy.  Because payroll fluctuates, the policy requires an audit to take place within three years after the policy ends.

First Rate's existing counterclaim arises from Zurich's refusal to perform a timely payroll audit, and then falsely reporting First Rate as an "Uncooperative" insured to the Workers' Compensation Insurance Ratings Bureau ("WCIRB"). Zurich's acts severely damaged First Rate by causing its premium to double in the following years.

After causing injury to First Rate, Zurich eventually performed a payroll audit and sued First Rate for additional past due premium.  But Zurich's audit was so flawed that its own counsel dismissed the lawsuit in the middle of discovery.  The same auditor performed another audit which First Rate has found flawed yet again. First Rate reasonably requested a neutral third-party audit, but Zurich refused, and sued First Rate again, which is this action.  Zurich's second inaccurate audit is the sole basis of Zurich's claims, which amount to a fraction of the damages suffered by First Rate at the hands of Zurich.

First Rate has since discovered that Zurich breached the insurance policies by failing to comply with its own California Department of Insurance rate filings as required by law.  This resulted in a substantial amount of additional premium for First Rate not only for the 2014 policy, but also for First Rate's 2012 and 2013 policies with Zurich.  According to documents and testimony recently uncovered, Zurich had a years-long policy of prejudicially issuing schedule modification debit surcharges at

1

or near the maximum of 50% for *all* temporary staffing companies, as well as placing those same staffing companies in Zurich's most expensive insurance carrier, which Zurich has officially named its "surcharge" carrier, resulting in further additional premium.

## II.   PROCEDURAL HISTORY

Zurich's complaint was filed on July 1, 2017, but not served on Defendant, First Rate until July 27, 2017.  (The filing dates are taken from the Court's docket.)  First Rate appeared on or about August 17, 2017 and, following a short extension, Answered on August 31, 2017.  On September 21, 2017 First Rate filed its First Amended Answer and Counterclaim.  On October 12, 2017 Zurich answered the Counterclaims.  The parties filed their Joint Report on October 19, 2017, exchanged initial disclosures around October 27, 2017, and the Court held a scheduling conference days later on October 30, 2017.

At the scheduling conference the court ordered the parties to attend a mandatory settlement conference with the Magistrate Judge Stevenson by April 16, 2018.  The expert report cut-off was set on February 16, 2018 and expert discovery cut-off on April 30, 2018.  Gjonola Dec. ¶ 5.

By mid-December the parties were discussing how to get the case in a position to possibly reach a settlement.  Counsel for First Rate sent opposing counsel an email attempting to get the Settlement Conference scheduled.  Gjonola Dec. ¶ 7.  At that time, Magistrate Stevenson's earliest availability was February 13, 2018.  *Id.*  However, by the time Zurich responded and schedules were cleared, the Magistrate had no dates available before March 20, 2017.  Gjonola Dec. ¶ 8.

On January 24, 2018 the parties stipulated to an amendment of the scheduling order to continue discovery and expert cut-off dates.  As expressly stated in that stipulation, the intent was to defer the large expenses associated with engaging experts and preparing expert reports prior to participating in the Mandatory

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION
FOR LEAVE TO AMEND ANSWER AND COUNTERCLAIM AND CONTINUE THE TRIAL

1   Settlement Conference.  Gjonola Dec. ¶ 12.  The Court entered the stipulated Order

2   on January 26, 2018.  Gjonola Dec. ¶ 5.

3        Additionally, beginning in November 2017, First Rate spent time reviewing

4   Zurich's initial disclosures and performing investigations of the documents and

5   surrounding events, and propounding written discovery.  Gjonola Dec. ¶ 6.  This work

6   product resulted in the conclusion that Zurich had not produced all of the relevant

7   documents, particularly its underwriting documents for First Rate, including the

8   Schedule Rating Work Sheets.  *Id.*  These should have been produced or identified in

9   Zurich's initial disclosures, because they are foundational to Zurich's calculation of

10  and claim for past due premium.  These documents became the subject of document

11  requests.  *Id.*

12       But the documents were not produced until about March 2, 2018, a day or two

13  before the depositions of Zurich employees.  *Id.*  In fact, the depositions were

14  repeatedly delayed from their originally scheduled dates in early/mid-February

15  because Zurich stalled the production of the documents.  Gjonola Dec. ¶ 9.  These

16  started happening after Zurich had already deposed all of First Rate's witnesses and

17  corporate designees, in the first week of February, 2018.  *Id.*

18       It was not until the depositions of Zurich's witnesses on March 5 – 9, 2018 that

19  it was first revealed that Zurich had an unlawful secret policy of discriminating

20  against staffing companies, and that the policy was executed in collusion with its

21  managing general agent, World Wide.  Those facts form the basis of First Rate's

22  Second Amended Answer and Counterclaim.

23  **III.   LEGAL STANDARD**

24       **A. Good Cause To Permit Amendment And Continue The Trial.**

25       To establish good cause, parties seeking modification of a scheduling order

26  must generally show that, even with the exercise of due diligence, they cannot meet

27  the order's timetable.  *Johnson v. Mammoth Recreations, Inc.* 975 F2d 604, 609 (9th

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION
FOR LEAVE TO AMEND ANSWER AND COUNTERCLAIM AND CONTINUE THE TRIAL

Cir. 1992); *Minter v. Prime Equip. Co.* 451 F3d 1196, 1205, fn. 4 (10th Cir. 2006); *Optivus Tech., Inc. v. Ion Beam Applications S.A.* 469 F3d 978, 993 (Fed. Cir. 2006).

When determining good cause, courts consider: (1) the reason for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) whether a continuance would cure such prejudice. *Southwestern Bell Tel. Co. v. City of El Paso* 346 F3d 541, 546 (5th Cir. 2003) (involving amendment of pleadings), *and see,* Rutter Group Prac. Guide Fed. Civ. Pro. Before Trial Ch. 15-A, A. Pretrial Conferences and Scheduling Orders.

**B. Diligence Required.**

The moving party must demonstrate its collaboration with the district court in managing the case. See *In re San Juan Dupont Plaza Hotel Fire Litig.* 111 F3d 220, 228-229 (1st Cir. 1997); *Race Tires America, Inc. v. Hoosier Racing Tire Corp.* 614 F3d 57, 84 (3rd Cir. 2010). Courts regularly consider: (1) diligence in assisting the court in fashioning a workable scheduling order; (2) any actual or anticipated noncompliance resulted from circumstances not reasonably anticipated at the time of the scheduling conference; and (3) a prompt request for modification once it became apparent that compliance was not possible. *Hood v. Hartford Life & Acc. Ins. Co.* 567 F.Supp.2d 1221, 1224 (ED CA 2008), *and see,* Rutter Group Prac. Guide Fed. Civ. Pro. Before Trial Ch. 15-A, A. Pretrial Conferences and Scheduling Orders.

**IV.   ARGUMENT**

**A. There Is Good Cause For Granting Leave To Amend The Answer And Counterclaim, And Continuing The Trial And All Other Dates**

Here, the reason First Rate did not timely move for an amendment is because the date to amend was February 16, 2018, and First Rate did not discover the facts on which its amendment is based until the depositions it took between March 5-9, 2018. Moreover, in First Rate's effort to position the case for settlement, First Rate voluntarily allowed Zurich to take its depositions first, which took place in the first

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION
FOR LEAVE TO AMEND ANSWER AND COUNTERCLAIM AND CONTINUE THE TRIAL

half of February, 2018.  Gjonola Dec. ¶ 9.  Written discovery was diligently pursued throughout December 2017 and January 2018, in preparation for the depositions.

The importance of First Rate's desired Amendment could not be greater, for the following reasons.  Zurich's insurance policies require that "[a]ll premium for this policy will be determined by our manuals of rules, rates, rating plans and classifications."  Declaration of David Ginsburg ("Ginsburg Decl."), ¶ 1, and Exhibit ("Exh.") A.  Zurich must file its rating plans with, and have them approved by, the California Department of Insurance.  Insurance Code sections 11730(j), 11735(a), and 11737; 10 Cal. Code Regs. § 2509.32,

One of the components in determining premium is a schedule modification or rating.  Ginsburg Decl., ¶ 2, and Exh. B.  Zurich's schedule rating rate filing required Zurich to review various individual characteristics of the insured and then assign a credit or debit for each category.  These include, among others, "premises", "medical facilities", and "safety devices."  A copy of the applicable Zurich schedule rating rate filing is attached as Exhibit C and was in effect from 2007 through the full policy periods for each of the three policies First Rate purchased from Zurich.  Ginsburg Decl., ¶ 3, and Exh. C.  The schedule rating rate filing had a maximum credit or debit of 50%.  *Id.*  First Rate received 50% debits for its 2012 and 2013 policies and a 32% debit for its 2014 policy.  Ginsburg Decl., ¶¶ 2, 4, and 5, and Exh.'s B, D, and E.

On March 7, 2018, James Buck testified on behalf of Zurich as its 30(b)(6) designee for the topics of schedule modification and policy placement.  He revealed that Zurich had a policy of assigning the maximum or near maximum schedule debit of 50% to all temporary staffing insureds regardless of their individual characteristics.  Ginsburg Decl., ¶ 6, and Exh. F (Deposition of James Buck ("Buck Depo.") at 162:15 to 167:16)  Mr. Buck testified that Zurich never inspected First Rate's facilities or specifically reviewed any of the other schedule rating categories prior to issuing surcharge schedule debits.  Ginsburg Decl., ¶ 7, and Exh. G (Buck Depo. at 153:4-8; and 167:5-16).

1    Mr. Buck disclosed that Zurich did not evaluate schedule modifications for

2  temporary staffing insureds in the manner required by its policies and rate filings until

3  Zurich raised its workers' compensation rates across the board in 2015.  Ginsburg

4  Decl., ¶ 8, and Exh. H (Buck Depo. at 165:15 to 167:16).  But this was after Zurich

5  had applied the maximum or near maximum debits to all three First Rate policies.

6  Ginsburg Decl., ¶¶ 2, 4, and 5, and Exh.'s B, D, and E.

7    Compounding Zurich's heretofore undisclosed policy of punishing temporary

8  staffing companies are two egregious actions taken by Zurich specifically with First

9  Rate.  First, Zurich admitted that First Rate's schedule rating worksheet used to

10 determine the schedule modification showed a 5% schedule rating for First Rate's

11 2013 policy.  Ginsburg Decl., ¶¶ 9-10, and Exh.'s I and J (Buck Depo. at 171:22 to

12 172:13)  Rather than apply the 5% debit, Zurich applied a 50% debit.  Ginsburg Decl.,

13 ¶ 5, and Exh. E.  And at least two years after the policy ended, Zurich fraudulently

14 created an unsigned and undated 50% schedule rating worksheet to make it look like

15 the 50% debit was the correct one.  Ginsburg Decl. ¶¶ 11-12, and Exh.'s K and L

16 (Buck Depo. at 173:24 to 176:10).

17    Second, Zurich admitted it never prepared a schedule rating worksheet for the

18 2014 policy.  Ginsburg Decl. ¶ 13, and Exh. M (Buck Depo. at 179:16 to 180:11)  At

19 a minimum, there should have been 0 for the 2014 schedule modification.  Instead,

20 Zurich used a 32% debit schedule modification, resulting in additional approximate

21 $438,000 in premium for the 2014 policy.  Ginsburg Decl., ¶ 2, and Exh. B.  Zurich's

22 use of 50% schedule modifications for the 2012 and 2013 policies resulted in

23 overinflated premiums of at least $200,000 that First Rate has already paid.  Ginsburg

24 Decl., ¶¶ 4 and 5, and Exh.'s D, and E.  A copy of Zurich's 2012 California schedule

25 rating worksheet is attached as Exhibit N to the Ginsburg Declaration.

26    Zurich also breached its insurance policies and engaged in tortious activity by

27 violating its own rate filings in another manner.  Mr. Buck divulged that since 2011

28 and continuing to this day, Zurich places all temporary staffing insureds in its most

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION
FOR LEAVE TO AMEND ANSWER AND COUNTERCLAIM AND CONTINUE THE TRIAL

expensive carrier.  Ginsburg Decl. ¶ 15, and Exh. O (Buck Depo. at 41:2 to 42:21)  Its rate filing, the applicable pages of which are attached as Exhibit P, requires insureds to be placed in carriers based on an assessment of their losses, years in business and financial information.

Mr. Buck testified that Zurich does not follow its rate filing.  Ginsburg Decl. ¶ 17, and Exh. Q (Buck Depo. at 192:14 to 193:6)  He stated that Zurich's "compliance" department has determined that temporary staffing companies are automatically and uniformly placed in the most expensive Zurich carrier.  *Id*.  Mr. Buck was unable to point to any language in the rate filing which allows the placement of all temporary staffing insureds in the most expensive Zurich carrier.  *Id*. On average, the rates for the most expensive carrier are 20% higher than the rates for the next most expensive carrier.  Ginsburg Decl. ¶ 18, and Exh. R.  At a minimum, First Rate should have qualified for the second most expensive carrier.  Zurich's failure to place First Rate with that carrier resulted in a total overcharge of premium for all three policies of at least $400,000.

Mr. Buck also disclosed that Zurich's managing general agent, World Wide Specialty Programs, Inc. ("World Wide") was heavily involved in underwriting First Rate, including in the assignment of the debit schedule modifications and the placement of First Rate in Zurich's most expensive carrier.  Ginsburg Decl. ¶ 19, and Exh. S (Buck Depo. at 26:14 to 29:21; 30:21-25; 38:7 to 39:9; 40:13 to 42:21; 44:1-21; 46:7-11; 46:25 to 47:9; 51:18 to 52:25; 65:23 to 66:9; 152:16-19; 156:14 to 157:6; 157:10 to 158:1; 161:19 to 162:1; 180:16-24; and 192:20 to 193:6)    World Wide therefore shares liability with Zurich for the damages resulting from the claims addressed above.

First Rate had no knowledge of these facts prior deposing Zurich's corporate representatives between March 5-9, 2018.  Only then did First Rate discover that Zurich cheated First Rate out of hundreds of thousands of dollars by disregarding Zurich's rate filings and enforcing its secret discriminatory policies against staffing

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION
FOR LEAVE TO AMEND ANSWER AND COUNTERCLAIM AND CONTINUE THE TRIAL

companies.

First Rate could not have discovered these facts prior to the above discovery in this case because the facts were exclusively known to Zurich and World Wide, and never shared with First Rate. Indeed, the facts were concealed from First Rate to the extent that First Rate had an expectation that the insurance policy Zurich offered to First Rate complied with Zurich's rate filing and with California insurance regulations. First Rate had no reason to suspect any deviation from those rules and regulations.

Moreover, the entire thrust of First Rate's Second Amended Answer and Counterclaim is that, based on the brand new facts, a large percentage of the premium First Rate paid Zurich over three annual policies was unlawful. And in Zurich's present law suit it is attempting to collect premium from the 2014 policy to which it is not entitled because First Rate was placed with the most expensive carrier and then surcharged over 30% on an already inflated premium.

**B. First Rate Has Been Diligent Throughout The Litigation.**

In addition to diligently defending itself in the short time since this case was filed, and diligently pursuing the avenue toward settlement, First Rate has remained diligent since discovering the new facts. Immediately after the March 9, 2018 deposition First Rate focused its attention on the Court-Ordered Mandatory Settlement Conference in the hopes of settling this case 10 days later. Gjonola Dec. ¶ 10. First Rate devoted substantial time and efforts to writing briefs and preparing for a successful Settlement Conference. *Id.* That included setting forth these newly discovered facts in the Settlement Conference Statement so that Zurich would understand its potential exposure here. *Id.*

Despite First Rate's efforts, the March 20, 2018 Settlement Conference was unfruitful, requiring First Rate to race against the clock in an effort to squeeze a tremendous amount of expert work into just 3 weeks. Gjonola Dec. ¶ 12. With the

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION
FOR LEAVE TO AMEND ANSWER AND COUNTERCLAIM AND CONTINUE THE TRIAL

need to have experts designated and expert reports fully completed by April 16, 2018, First Rate spent the majority of the two weeks since the Settlement Conference getting experts up to speed and preparing reports that have to be complete and relied on at trial.  *Id.*  At the same time First Rate was drafting its Second Amended Answer and Counterclaim, and then this Ex Parte Application.  Gjonola Dec. ¶ 12-13.  To add to the weight of the workload, Zurich propounded additional written discovery on March 24, 2018.  Gjonola Dec. ¶ 14.

The Second Amended Answer and Counterclaim was presented to Zurich's Counsel on March 30, 2018, with a request that Zurich stipulate to its filing and a trial continuance.  Gjonola Dec. ¶ 13.  Zurich's counsel failed to respond to multiple requests to stipulate, until First Rate sent a notice of this ex parte application, near the end of the day, April 3, 2018.  *Id.*

**C. Zurich Will Not Be Prejudiced By The Relief First Rate Seeks.**

Zurich has no basis for opposing this Application except its desire to avoid having to answer for its unlawful policies that targeted and discriminated against First Rate for being a staffing company.  But a denial of this motion will not spare Zurich from having to defend its unlawful rating schemes.  If this motion is denied, then First Rate will be forced to file its own lawsuit to pursue its claims against Zurich.  This will result in redundancy and massive waste of judicial resources.

In both cases, First Rate will prove that Zurich followed an unlawful and discriminatory scheme to overcharge First Rate.  The facts will be tried here to prove that Zurich is not entitled to recover $1.2 million in premium on the 2014 policy because that amount is calculated using Zurich's unlawful and discriminatory policies, rather than using its California rate filings.  The same facts will be tried in First Rate's lawsuit to prove the First Rate is entitled to affirmatively recover the premium that Zurich overcharged First Rate in all three policy years, 2012-2014.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION
FOR LEAVE TO AMEND ANSWER AND COUNTERCLAIM AND CONTINUE THE TRIAL

1    Avoidance of an additional lawsuit with almost entirely redundant proceedings is

2    itself good cause for granting First Rate's instant application for leave to amend.

3            Zurich may argue that it will be prejudiced if its ability to collect an alleged

4    debt from First Rate is delayed.  But there is no prejudice to a billion-dollar

5    multinational insurance company from a short delay in collecting just over $1 million;

6    particularly given that Zurich is seeking prejudgment interest as part of its award.  In

7    the procedurally analogous situation where defendants seek stays (often, pending the

8    completion of related cases), courts have uniformly agreed that a delay in recovering

9    monetary damages is insufficient grounds to deny a motion to stay.

> A delay in recovering potential monetary damages is not sufficient
> prejudice to warrant denial of a stay. *See CMAX*, 300 F.2d at 268-69
> (noting that a delay in trial would only delay the recovery of monetary
> damages and thus that plaintiff had "not ma[d]e a strong showing in
> support of its assertion that it will suffer irreparable damages and a
> miscarriage of justice"); *Liberty Surplus Ins. Corp. v. IMR Contractors
> Corp.*, No. CV 08-5773 JSW, 2009 WL 1010842, at *4 (N.D. Cal. Apr.
> 14, 2009) (finding that "a delay in recovering potential monetary
> damages" did not warrant denial of a stay).

*Larsen v. City of Los Angeles*, No. CV1204392GAFAJWX, 2012 WL 12887557, at
*9 (C.D. Cal. Aug. 3, 2012)

            What Zurich really fears is that First Rate is going to prove that Zurich has

violated the law and overcharge First Rate by almost half a million dollars for three

years in a row.  But that is justice, not prejudice.  *Cf., CMAX, Inc. v. Hall*, 300 F.2d

265, 269 (9th Cir. 1962)  (Finding that a stay, during which "evidence will be

obtained, or rulings made" ... "is not the kind of prejudice which should move a court

to deny a requested postponement" and "justice will be served by having [weakness in

plaintiff's case] revealed prior to the district court trial.")

            Additionally, Zurich itself is already responsible for a two and a half year delay

in attempting to collect the $1.2 million it now seeks.  The alleged debt arises from a

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION
FOR LEAVE TO AMEND ANSWER AND COUNTERCLAIM AND CONTINUE THE TRIAL

1  payroll audit that resulted in an increased workers' compensation insurance premium.

2  Zurich could have collected its premium if Zurich auditor Joseph Pereira had

3  performed an audit in August of 2015.  He recently testified that he unilaterally

4  decided not to perform the audit so that he could close his book on First Rate to meet

5  a monthly quota that Zurich imposed on him.  When Zurich got around to suing First

6  Rate the following year on May 31, 2016, Mr. Pereira performed an audit that was so

7  flawed and totally incorrect that Zurich voluntarily dismissed its lawsuit.  (See, Case

8  2:16-cv-03779-DMG-JPR)  After taking time to try to figure out what went wrong,

9  Zurich sued First Rate again in this proceeding in July 2017, again wielding a flawed

10 audit from the same Mr. Pereira.  (See Complaint, filed July 7, 2017)  As alleged by

11 First Rate in its existing counterclaim, if Mr. Pereira had perform an accurate audit,

12 and done so in August of 2015 as he should have, First Rate would not have been

13 injured and Zurich would have received its $1.2 million.  But Mr. Pereira shrugged

14 off his duties, and the rest is history, leading to First Rate's recent discovery that

15 Zurich has been cheating them for years.

16      Moreover, if First Rate cannot amend its counterclaim, and is required to file its

17 own lawsuit, then according to the authorities cited above - *CMAX, Inc. v. Hall*, 300

18 F.2d 265, 269 (9th Cir. 1962), *Liberty Surplus Ins. Corp. v. IMR Contractors Corp.*,

19 No. CV 08-5773 JSW, 2009 WL 1010842, at *4 (N.D. Cal. Apr. 14, 2009), and

20 *Larsen v. City of Los Angeles*, No. CV1204392GAFAJWX, 2012 WL 12887557, at

21 *9 (C.D. Cal. Aug. 3, 2012) – the instant case should be stayed until First Rate's

22 lawsuit against Zurich and World Wide is complete.  That result is necessitated by the

23 fact that First Rate's claims against Zurich undermine the calculation of premium that

24 Zurich seeks in this lawsuit.  Thus, in a subsequent lawsuit by First Rate, "evidence

25 will be obtained, or rulings made" regarding the foundation of Zurich's claims.  "And

26 if its case is weak, justice will be served by having that fact revealed prior to the

27 district court trial."  *CMAX, Inc. v. Hall*, 300 F.2d 265, 269 (9th Cir. 1962)

28

1

**D. Even If The Court Denies Leave To Amend, The Court Should**

2

**Continue The Trial To Allow First Rate Sufficient Time To Pursue**

3

**Further Discovery Into The Recently Revealed Facts.**

4     Even barring an amended counterclaim or additional counter-defendant, First

5  Rate remains in need of additional time to continue its discovery concerning the

6  creation, maintenance, and enforcement of Zurich's unlawful policies, uncovered in

7  recent depositions.  All of the information concerning those policies is entirely within

8  Zurich's control and essentially concealed from First Rate.  If discovery closes on

9  April 30, 2018 as currently scheduled, then First Rate will have had no opportunity to

10 factually develop a major defense to Zurich's claim for past due premium.  First Rate

11 will have to defend itself at trial with little more than it knew before discovery

12 uncovered a major defense to Zurich's claim.  This is the major reason this

13 application had to be made ex parte.

14     Additionally, the expert report due date is April 16, 2018, which also

15 necessitated this ex parte application.  First Rate has not had enough time since

16 uncovering the newly discovered facts in mid-March to engage a Workers'

17 Compensation expert to opine on this evidence.  Additional separate expert work is

18 necessary to perform calculations of what the correct premium would have and should

19 have been if Zurich had followed its rate filing, as required by law, rather than

20 discriminatorily assigning First Rate excessive premium just because it is a staffing

21 company.  Again, there has not been sufficient time since mid-March to engage an

22 expert for this heretofore unexpected purpose.  Therefore, even if the Court denies

23 First Rate's request for leave to amend its answer and counterclaim, the Court should

24 still amend the Scheduling Order and continue all dates by six months to permit First

25 Rate a through development of the facts.

26

27

28

1

## V.     CONCLUSION

Based on the foregoing evidence and argument, First Rate requests leave to file its Second Amended Answer and Counterclaim, and a continuance of the trial all dates in the Scheduling Order by eight months, or longer if necessary to accommodate the additional counter-defendants.


Dated:   April 6, 2018                              ROXBOROUGH, POMERANCE, NYE & ADREANI, LLP


                                                    By:   */s/ Joseph C. Gjonola*
                                                          Nicholas P. Roxborough
                                                          David R. Ginsburg
                                                          Joseph C. Gjonola
                                                    Attorneys for Defendant and Counterclaimant
                                                    First Rate Staffing Corporation

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION
FOR LEAVE TO AMEND ANSWER AND COUNTERCLAIM AND CONTINUE THE TRIAL